IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DANIEL THOMAS ROBBINS,<br>    Plaintiff,<br>v.<br><br>THE CITY OF DES MOINES, IOWA, Des Moines Police Detective BRAD YOUNGBLUT, Des Moines Police Lieutenant JOSEPH LEO, and Des Moines Police Sergeant CHRISTOPHER CURTIS,<br>    Defendants. | Case No. 4:18-CV-289<br><br>STATEMENT OF UNDISPUTEDD MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Nearly every moment of the events of May 10, 2018, that are the basis of this law suit have been captured by Des Moines Police Department Body Camera. (Strawser Dashcam, Strawser, Leo, Youngblut Body Cam) Because the film footage speaks for itself, the Defendants will set forth relevant portions of the videos herein, rather than tracking every moment of every moment of every video.[1]

1. On May 10, 2018, Detective Bradley Youngblut was leaving the police department to walk to his car. (App. at 16 ¶ 4)

2. Detective Youngblut observed Mr. Robbins filming or taking photographs of several vehicles parked on the west side of East 2nd Street and of Detective DeMoss as he walked to the rear of the police department. (App. at 16 ¶ 4)

3. Detective Youngblut was parked in an adjacent lot and remained in his vehicle observing Mr. Robbins for several minutes. (App. at 16 ¶ 5)

4. In the immediate vicinity are personal vehicles of officers, official police vehicles, seized vehicles from criminal activity, and undercover vehicles. (App. at 16 ¶ 6)

5. Seated in his car facing southbound adjacent to East 2nd Street, Detective Youngblut observed Mr. Robbins recording vehicles, license plates, and officers and civilian employees entering and leaving the Police Department. (App. at 16 ¶ 7)

---

[1] The time references are as close as could be ascertained while reviewing and recounting multiple overlapping videos.

6. Detective Youngblut became concerned about Mr. Robbins' intentions based on these actions. (App. at 17 ¶ 8)

7. Detective Youngblut was aware that vehicles had been stolen from and vandalized in this same area where police officers park personal vehicles, official vehicles, seized vehicles and undercover vehicles. (App. at 17 ¶ 9, 20, 25)

8. Detective Youngblut knew about a vehicle being stolen in that same police parking area within a few weeks prior to encountering Mr. Robbins. ((App. at 17 ¶ 10, 20)

9. It appeared to Detective Youngblut that Mr. Robbins was monitoring activity around the station, including the movement of officers and their vehicles. (App. at 17 ¶ 11)

10. For several minutes, Detective Youngblut observed Mr. Robbins continued filming or photographing of personal vehicles of officers, license plates, and at the windows of vehicles. (App. at 17 ¶ 12)

11. Detective Youngblut noticed Lieutenant Rhamy standing outside a vehicle talking to another officer and pulled alongside them and asked what Robbins was doing. They expressed not knowing what he was doing but they were concerned as well. (App. at 17 ¶ 13)

12. Detective Youngblut heard dispatch sending an officer out to investigate a suspicious person filming Police Department employee in the rear lot of the station. (App. at 17 ¶ 14)

13. Detective Youngblut pulled up alongside Mr. Robbins and asked what he was doing. Detective Youngblut perceived what Mr. Robbins began filming him by placing his camera on the bed of a truck parked there and pointing it at me. (App. at 17 ¶ 15)

14. Detective Youngblut asked Mr. Robbins what he was doing; Mr. Robbins refused to answer Youngblut's question or explain his intentions. (App. at 17 ¶ 16)

15. At that point, Detective Youngblut could see other officers approaching from the station toward Mr. Robbins so he exited his vehicle and activated my body camera. (App. at 17 ¶ 17)

16. Also on May 10, 2018, at approximately 11:32 a.m., Officer Michelle Strawser was flagged down in her police vehicle by Identification Technician, Angela Dierenfeld. (App. at 6, Strawser Dash Cam :09, Exterior Camera-East)

17. Angela Dierenfeld informed Officer Strawser that a man was taking pictures of her, her personal vehicle and of other vehicles near the "Ident garage". (App. at 6, Strawser Dash Cam :09)

18. Officer Strawser also observed the man appeared to be taking photographs. (App. at 6)

19. Prior to approaching the man, Officer Strawser spoke to another officer who pointed out that she did not have her body camera on. (App. at 6)

20. Officer Strawser notified dispatch that she was out with a suspicious person and went back into the station to retrieve her body camera. (App. at 6, Strawser Dash Cam 2:17)

21. While inside the station, Officer Strawser notified Lieutenant Joseph Leo and Sergeant Chris Curtis about the man that she and Angela Dierenfeld had observed and her intentions to speak with him. (App. at 6)

22. Lieutenant Joseph Leo and Sergeant Chris Curtis accompanied Strawser outside. (App. at 6, Strawser Body Cam :30)

23. Lieutenant Leo approached Daniel Robbins and asks, "What's going on?" (Leo Body Cam 1:06)

24. Sergeant Curtis told Mr. Robbins that he was touching his truck as Robbins is leaning on the bed of a truck holding a camera. (Strawser Body Cam 2:10)

25. It appears to be at this time that Mr. Robbins was filming Detective Youngblut. (Strawser Body Cam 2:10)

26. Mr. Robbins moved away from having physical contact with the truck. (Strawser Body Cam 2:16)

27. Detective Youngblut indicated that he had asked about why Mr. Robbins was taking pictures of unmarked police cars and license plates, called it suspicious, and stated, "We've had a couple cars stolen from this lot, broken into, we've got a lot of equipment." (Youngblut Body Cam 1:17)

28. In response to Mr. Robbins asking, "What would it take to ease your suspicious? Detective Youngblut advised that an explanation about what Robbins was taking pictures of and why? (Strawser Body Cam 2:44, Leo Body Cam 1:36, Youngblut Body Cam, 1:21)

29. Mr. Robbins stated, "I'm taking pictures because it's perfectly legal for me to do so." Youngblut replied, "Just because it's legal doesn't mean it's not suspicious." (Strawser Body Cam 2:48, Leo Body Cam 1:41, Youngblut Body Cam 1:26)

30. Close in time to this exchange, Lieutenant Leo asked Mr. Robbins for some identification; Mr. Robbins stated that he didn't have any identification. (Strawser Body Cam 2:53, Leo Body Cam 1:46, Youngblut Body Cam 1:31)

31. Detective Youngblut informed Mr. Robbins, "Sir, just so you understand, your responses are what makes me even more suspicious because you're immediately difficult." (Strawser Body Cam 2:59, Leo Body Cam 1:52, Youngblut Body Cam 1:37)

32. Lieutenant Leo placed his left hand on Mr. Robbins shirt and lifts it then moves closer to pat Mr. Robbins; Mr. Robbins moves away from Lieutenant Leo and states, "Don't touch me." (Strawser Body Cam 3:05, Leo Body Cam 1:58, Youngblut Body Cam 1:43)

33. Lieutenant Leo asked Mr. Robbins, "What's in your pocket?" and placed his right hand on Mr. Robbins right upper arm and lifted Robbins left arm overhead while lifting the shirt. (Leo Body Cam 2:00)

34. Mr. Robbins stated that he didn't consent to anything; Lieutenant Leo responded, "Put your hands up there, you don't need to consent to anything." (Strawser Body Cam 3:10, Leo Body Cam 2:03)

35. There is ongoing discussion about suspicious behavior, including between Sergeant Curtis and Mr. Robbins. (Strawser Body Cam 3:14, Leo Body Camera 2:07, Youngblut Body Cam 1:52)

36. Lieutenant Leo asked other officers on scene, "Who saw him looking into cars?" Mr. Robbins responded, "In cars? In cars? Let's be clear about in cars or not." (Strawser Body Cam 3:35, Leo Body Cam 2:27, Youngblut Body Cam 2:12)

37. Officer Strawser indicated she had a report from Angie; Lieutenant Leo suggests Strawser speak with her. (Strawser Body Cam 3:41, Leo Body Cam 2:34)

38. While Officer Strawser was attempting to reach Angie, there was ongoing discussion between Leo, Youngblut, Curtis, Lieutenant Josh Rhamy and Mr. Robbins about why he didn't have identification on him, what his name was, and whether he has to give them his name. (Leo Body Cam 2:45, Youngblut Body Cam 2:30)

39. Mr. Robbins asked what crime he had committed; Detective Youngblut continued to indicate that his actions were suspicious and confirmed that was not a crime. (Leo Body Cam 2:57, Youngblut Body Cam 2:42)

40. Lieutenant Leo Detective Youngblut, Sergeant Curtis inquired about Mr. Robbins' motivations; Youngblut asked, "Who crossed you that you have to act like this when all we're doing is asking simple questions because your taking pictures of unmarked police vehicles, undercover police vehicles? (Leo Body Cam 3:10, Youngblut Body Cam 2:55)

41. Mr. Robbins asked for a code citation for what crime he was committing. (Youngblut Body Cam 3:05)

42. Detective Youngblut asked what organization Mr. Robbins belonged to that was making him be so difficult. (Youngblut Body Cam 3:12)

43. Then further exchange occurred about whether Mr. Robbins was involved with an organization of some sort. Curtis then advised Robbins he was not allowed in front of the station. Mr. Robbins indicated that it was a public sidewalk. (Leo Body Cam 3:29, Youngblut Body Cam 3:14)

44. Curtis told Mr. Robbins to "move down on the sidewalk, down the road." Robbins replied, "It's a public sidewalk, sir. Are you releasing me? Am I free to go?" Curtis stated, "Yep. Okay." (Leo Body Cam 3:29, Youngblut Body Cam 3:14)

45. Mr. Robbins remained at the same location, stating "Okay then, I'm free to stay as well." Captain Curtis responded, "So are we." (Leo Body Cam 3:55, Youngblut Body Cam 3:39)

46. Officer Strawser spoke with Officer DeMoss about what he saw. DeMoss demonstrated and stated that Mr. Robbins appeared to be "filming right in them". Strawser gave that information to Leo. (Strawser Body Cam 5:21)

47. There is then an exchange between Mr. Robbins and Lieutenant Rhamy and potentially another officer as the officers suggest that Mr. Robbins is loitering and again ask his name. Mr. Robbins denies loitering and states he is doing nothing wrong. (Youngblut Body Cam 3:53)

48. Mr. Robbins asks Lieutenant Rhamy what police academy he attended and for his name. Lieutenant Rhamy states that Mr. Robbins is loitering and states Robbins is required to give him information or he would be arrested. (Youngblut Body Cam 3:55)

49. Detective Youngblut then states that he can just make a suspicious activity case and confiscate the camera until the police "have a reason for what you are doing" and "know you have a legitimate purpose. He then asks Mr. Robbins for his information. (Youngblut Body Cam 4:00)

50. Mr. Robbins asked, "Am I detained at this point?" Detective Youngblut responded, "Yes." Lieutenant Rhamy asked if Mr. Robbins had identification; Mr. Robbins answered that he did not. (Youngblut Body Cam 4:30)

51. Detective Youngblut then went to his vehicle and retrieved a binder; other officers searched Mr. Robbins' person. (Youngblut Body Cam 4:35)

52. Officer DeMoss described Mr. Robbins using his camera to look inside cars. He pointed to some vehicles and stated, Robbins "was filming like right in them." When Lieutenant Leo asked further, "Which cars?", De Moss stated, "At least the one parked behind this one." (Strawser Body Cam 5:56, Leo Body Cam 4:40)

53. Several officers were standing around Mr. Robbins; Mr. Robbins had his hands on a truck and it appears he is still being searched. (Strawser Body Cam 7:31)

54. Lieutenant Leo asked Officer De Moss whether the vehicle he had referred to was an unmarked or personal vehicle; DeMoss indicated not knowing which it was. (Leo Body Cam 5:09)

55. Lieutenant Rhamy again asked Mr. Robbins, "Why are you down here taking pictures of license plates, what are you doing?; Mr. Robbins responded, "What are you doing?"; Detective Youngblut responded, "Investigating suspicious activity." (Leo Body Cam 5:28)

56. Detective Youngblut continued to ask Mr. Robbins for his name; Mr. Robbins continues not to provide identifying information, and eventually stated, "John Doe." (Youngblut Body Cam 5:20)

57. Lieutenant Rhamy asked Mr. Robbins, "Do you understand interference with an official act?"; Mr. Robbins replied, "I understand, I absolutely do but you don't have that." (Youngblut Body Cam 5:23, Leo Body Cam 5:40)

58. Detective Youngblut indicated that they are trying to conduct investigation; Lieutenant Rhamy told Mr. Robbins it was his last chance to give his information. (Leo Body Cam 6:00)

59. Mr. Robbins provided his last name, and stated that he was doing so under threat of arrest; Detective Youngblut stated, "Absolutely, I understand that. First Name."; Mr. Robbins stated, "Daniel." (Leo Body Cam 6:07)

60. Officer DeMoss indicated to Lieutenant Leo that the vehicle he had referenced earlier is "a personal one, it's a Lexus with a firefighter's plate on it. "He further responded to Leo's question, "But was he looking inside that car? Like filming the inside of it?"

DeMoss stated, "Yeah" and demonstrated with his cell phone up to the driver side window. (Leo Body Cam 6:12)

61. Mr. Robbins stated, "I don't need to listen to you, sir. I have what's called freedom of speech. I understand my rights." (Strawser Body Cam 7:37, Leo Body Cam 6:30, Youngblut Body Cam 6:14)

62. Lieutenant Leo said to Officer Strawser, "Hey do you want to call Ident or somebody with a camera so we can take a picture of this of this guy?" (Leo Body Cam 6:31)

63. Captain Curtis attempted to quiet Mr. Robbins and stated, "This is a guy…everyone of you guys come down for this exact purpose."; to which, Mr. Robbins replied, "No, it's not."; Curtis replied, "Because your angry at the world." (Strawser Body Cam 7:44, Leo Body Cam 6:37, Youngblut Body Cam 6:21)

64. Mr. Robbins asked about what caused all of the officers to misbehave; then clarified that he meant that about any officer involved in his detention. (Leo Body Cam 6:43)

65. An officer asked Robbins, "How have we harmed you"; Robbins responded, "You've held me against my will" and "I don't want to be held against my will." (Leo Body Cam 7:01)

66. An officer asked Robbins, "Why are you down here taking pictures?" Robbins did not provide an answer. An officer stated, "Can't answer that can you?" (Leo Body Cam 7:08)

67. Lieutenant Leo asked, "Got his name and all that?" Youngblut replied, "Yeah. I'm going to finish. Put the camera on property until he can give me a logical reason." (Leo Body Cam 7:08, Youngblut Body Cam 6:50)

68. Lieutenant Leo stated, "I have someone coming down with a camera to take a picture of him too." Youngblut responded, "Youngblut: Well, I got all that. I'll do the case and take pictures." Leo instructed Strawser that they no longer needed anyone to come take Robbins' photograph. (Leo Body Cam 7:20)

69. Detective Youngblut stated that he is making a " suspicious activity case" and putting the camera "in property" until Mr. Robbins would give him a "logical reason for why you're recording it." (Youngblut Body Cam 6:57)

70. Lieutenant Rhamy advised Robbins to check the law on trespass and loitering before he comes to the station next time.

71. Detective Youngblut asked Lieutenant Rhamy, "Are we confiscating this until we know what reason he's down here and the suspicious activity?" Lieutenant Rhamy, responded,

"We have every reason to." Mr. Robbins asked, "Do you have a warrant?" Detective Youngblut responded, "No, I'm going to confiscate it for suspicious activity." (Youngblut Body Cam 7:43)

72. Mr. Robbins asked, "But was it involved in a crime?" Detective Youngblut responded, "I've got to investigate it." (Leo Body Cam 8:07)

73. Mr. Robbins asked, "You don't know if there's been a crime or not?" Detective Youngblut stated, "Nope, we're going to investigate though. I'll give you my card so you know." (Strawser Body Cam 9:08, Leo Body Cam 8:15, Youngblut Body Cam 8:02)

74. Detective Youngblut asked for Robbins' address and Robbins provided that information. (Leo Body Cam 8:51, Youngblut Body Cam 8:35)

75. Detective Youngblut went through items confiscated from Mr. Robbins during search. (Leo Body Cam 9:23, Youngblut Body Cam 9:07)

76. An officer stated, "You know there might be pictures of the federal building on there too. He's down here doing it here, he's probably doing it at other government facilities." (Leo Body Cam 9:57)

77. Officer Strawser speaks by phone to Angie. Strawser relays that Angie indicated that she was leaving in her personal vehicle and Mr. Robbins was taking pictures of her, her vehicle, other vehicles and that she thought it was "weird cause you know". (Strawser Body Cam 10:13)

78. Detective Youngblut advised Mr. Robbins of his name and rank. (Leo Body Cam 10:11, Youngblut Body Cam 9:55)

79. Youngblut stated to Robbins, "I was simply asking you about your suspicious nature. You're taking photographs down here. I'm going to confiscate your camera, at this time. I don't know your reasoning. You have yet to give any logical reason other than you'd like to challenge authority today. Other than that, I don't know what your reasons or logic is. I hope it is not for nefarious deeds. For that purpose, I'm going to confiscate your camera at this point under suspicious activity situation. I don't know what else is on your camera. What I may do, when I'm not actively working homicide that occurred two weeks ago, I'll write a search warrant in regard to your camera. I'll then download everything on your camera because I don't know what else you've taken pictures of." (Leo Body Cam 10:11, Youngblut Body Cam 9:55)

80. Detective Youngblut further advised, "Given the fact that our police station has been bombed before, two cars stolen from this rear lot in recent days, you're down here among several undercover cars, that for our safety, if people were to know who they are. I don't

know what your recording but for those purposes I'm probably download with a search warrant due to suspicious activity. Once all that's completed I'll have all the information I'll probably at that point be able to return your camera but not until then. (Leo Body Cam 10:11, Youngblut Body Cam 9:55)

81. Detective Youngblut stated, "Given those circumstances, I'm going to advise you of trespassing for down here at 25 E 1st Street. If you have a reason to come down to the police, please make arrangements. To file a complaint, you'll need to make arrangements so we know you are coming. Cause I don't know if you are down here yet to challenge authority or you actively have some reason that you're back here recording personal vehicles of police officers, squad cars, our action, are movements. (Youngblut Body Cam 10:58)

82. Given all these details, you understand why you were detained? Do you understand why I'm taking your camera at this point in time and what will be coming in the future? (Youngblut Body Cam 11:25)

83. Mr. Robbins replied, "I'm am under no obligation to respond to that." Detective Youngblut wished him a nice day and reminded Robbins that he had Youngblut's business card. (Leo Body Cam 11:44, Youngblut Body Cam 11:28)

84. Officers discuss confiscating Robbins' cell phone, as well, as it may also have photographs on it. Detective Youngblut indicated they would confiscate the phone, as well. Detective Youngblut provided Mr. Robbins with information about filing a complaint in the station before the trespass took effect.  (Leo Body Cam 11:50, Youngblut Body Cam 11:34)

85. Mr. Robbins asked, "Have you completed your stop?" (Leo Body Cam 13:09, Youngblut Body Cam 12:53)

86. Detective Youngblut stated, "Yes. You're free to go." (Leo Body Cam 13:10, Youngblut Body Cam 12:52)

87. Detective Youngblut advised Mr. Robbins during the stop that his behavior was suspicious and that his refusal to answer questions about his purpose and intent for being there and photographing officers and civilian staff was another reason for suspicion; he still refused to provide an explanation or to even disclose his name. (App. at 17 ¶ 20)

88. In Youngblut's 17 years of experience, the Des Moines Police Department has had individuals tracking movements of officers for criminal purposes. (App. at 16 ¶ 3, 17 ¶21)

89. One example of this behavior occurred with the murders of Des Moines Police Sergeant Anthony Beminio and Urbandale Police Officer Justin Martin; I was the lead investigator on that case and am aware of the evidence in that investigation. The suspect of that investigation had a history of filming police officers and his interactions with them and posting them online. He also utilized his knowledge of the activities of the Urbandale Police Department in an effort to lure an officer into the ambush he committed upon Officer Justin Martin. Utilizing his own personal knowledge and experience with the officers, the suspect explained to this detective that this was how he was able to create the situation resulting in the death of Officer Martin and leading to the death of Sergeant Beminio. (App. at 18 ¶ 22)

90. Due to my experience with individuals targeting officers for criminal purposes, Mr. Robbins behavior in monitoring police activity and vehicles, in an area that had several times been the scene of vehicle thefts and vandalism, combined with his refusal to respond to questions about his purpose for being there and monitoring police activity and vehicles, lead me to briefly detain him and to seize his camera and camera phone. At that point in time the intentions of Mr. Robbins as well as complete knowledge of where he had filmed, photographed or monitored around the back of the police station was unknown and created the circumstances of making his actions seem suspicious in nature and a possible threat to the safety of both officers and civilian employees of the Des Moines Police Department. (App. at 18 ¶ 23)

91. Further investigation found that Mr. Robbins has a YouTube page with videos of similar interactions he has had around the Des Moines Metro area challenging his right to film anyone he wishes, including both police officers and private citizens. Mr. Robbins' page also includes anti-police news stories and other unfavorable references to law enforcement activities. I also learned that Mr. Robbins regularly takes photographs of Police Department vehicles that he believes to be illegally parked. (App. at 18 ¶ 24)

92. Once the Department got the May 16, 2018, demand for Robbins' property to be returned, the situation was discussed with Command Staff of the Des Moines Police Department. It was determined, based on information known at that time and the investigation of Mr. Robbins and his most likely intentions, to release the items back to Mr. Robbins. (App. at 18 ¶ 25)

93. It is the policy of the City of Des Moines Police Department to observe the constitutional rights of individuals. (App. at 32).

94. All of the named officers have been trained to observe individuals' constitutional rights. (App. at 37-96, 97-141, 142-176)

Respectfully Submitted,

*Michelle Mackel-Wiederanders*

Michelle Mackel-Wiederanders
Assistant City Attorney
400 Robert D. Ray Drive
Des Moines, IA  50309-1891
Telephone: (515) 283-4537
E-Mail:  MRMackel@dmgov.org
ATTORNEY FOR DEFENDANTS