IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| DANIEL THOMAS ROBBINS, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION No.: 4:18-cv-289 |
| v. | : | |
| | : | |
| THE CITY OF DES MOINES, IOWA, | : | PLAINTIFF'S MEMORANDUM OF |
| Des Moines Police Detective BRAD | : | AUTHORITIES IN RESITANCE TO |
| YOUNGBLUT and Des Moines Police | : | DEFENDANTS' MOTION FOR |
| Lieutenant JOSEPH LEO, and | : | SUMMARY JUDGMENT |
| Des Moines Police Sergeant | : | |
| CHRISTOPHER CURTIS, | : | |
|     Defendants. | : | |

COMES NOW Plaintiff Daniel Robbins, through the undersigned counsel, and

submits this brief in resistance to the Defendants' Motion for Summary Judgment:

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................2

SUMMARY JUDGMENT STANDARD .................................................................3

ARGUMENT ..........................................................................................................4

    I.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
           IMMUNITY ON ROBBINS' CLAIM THAT THEY SEIZED
           HIM IN VIOLATION OF THE FOURTH AMENDMENT ...............................4

         A.    Applicable legal principles .......................................................4

         B.    A genuine issue of material fact exists as to whether
              the law enforcement Defendants violated Robbins
              clearly established Fourth Amendment right to be
              free from a *Terry* stop unsupported by reasonable
              suspicion ...................................................................................5

         C.    A genuine issue of material fact exists as to whether
              the law enforcement Defendants violated Robbins
              clearly established Fourth Amendment right to be
              free from arrest absent probable cause ....................................8

II.     DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
        IMMUNITY ON ROBBINS' CLAIM THAT THEY SEIZED HIS
        CAMERA AND PHONE IN VIOLATION OF THE FOURTH
        AMENDMENT ............................................................................................... 10

        A.     The law enforcement Defendants' seizure of Robbins' camera
               without a warrant or probable cause to believe that it is
               evidence of a crime violates the Fourth Amendment ............................... 11

        B.     The law enforcement Defendants' seizure of Robbins' camera
               without a warrant or probable cause to believe that it is
               evidence of a crime violates the Fourth Amendment ............................... 12

III.    THE LAW ENFORCEMENT DEFENDANTS ARE NOT
        ENTITLED TO QUALIFIED IMMUNITY ON ROBBINS'
        FIRST AMENDMENT RETALIATION CLAIM ............................................. 13

        A.     Robbins had a clearly established right to be free from
               retaliation for recording images in plain sight from a
               public place ......................................................................................... 14

        B.     Robbins had a clearly established right to protest the police
               action without retaliation ...................................................................... 17

IV.     THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT
        ON ROBBINS' *MONELL* CLAIM ......................................................... 18

CONCLUSION ............................................................................................... 24

## INTRODUCTION

Plaintiff Daniel Robbins, a citizen of the United States and resident of Iowa, brings this lawsuit against the City of Des Moines ("City") and Des Moines Police Detective Brad Youngblut, Des Moines Police Lieutenant Joseph Leo, and Des Moines Police Sergeant Christopher Curtis ("law enforcement Defendants").  Robbins' raises several constitutional claims pursuant to 42 U.S.C. section 1983 as well as a *Monell* claim based on the City's failure to train its employees.  The Defendants seek summary judgment as to all claims. For the reasons that follow, their summary judgment motion must be denied in its entirety.

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (moving party has initial responsibility of demonstrating absence of genuine issue of material fact). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobb, Inc.*, 477 U.S. 242, 248 (1986). At this stage, the court is not to determine credibility, weigh the evidence, or determine the truth of the matter. *Id.* at 249, 255. Instead, the Court views the record in the

light most favorable to the nonmoving party and determines whether there is a genuine issue

for trial. *Id.*

## ARGUMENT

## I.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON ROBBINS' CLAIM THAT THEY SEIZED HIM IN VIOLATION OF THE FOURTH AMENDMENT

In Count II of his complaint, Robbins asserts a claim under 42 U.S.C. section 1983

against the law enforcement Defendants that he was illegally seized without probable cause in

violation of the Fourth Amendment.  (Complaint at ¶ 89).  To establish a claim under section

1983, Robbins must show there was a violation of his constitutional rights committed by a

person under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  The law enforcement

Defendants deny that Robbins was arrested and assert that they had reasonable suspicion to

conduct a *Terry* stop.  (Def's MSJ Memo. at 5-7).  Accordingly, they contend no constitutional

violation occurred.  Alternatively, they claim they are entitled to qualified immunity.

### A.   Applicable legal principles

Qualified immunity insulates a government official from civil damages liability

when the official's actions do not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982).  For a right to be clearly established, the right's contours must be sufficiently

clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Individual liability thus turns on the

objective legal reasonableness of the defendant's actions assessed in light of clearly

established law at the time.  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *Anderson*, 483

U.S. at 639-40.  In *Harlow*, the court explained that a key question is "whether that law

was clearly established at the time an action occurred" because [i]f the law at that time was

not clearly established, an official could not reasonably be expected to anticipate

subsequent legal developments, nor could he fairly be said to 'know' that the law forbade

conduct not previously identified as unlawful. *Harlow*, 457 U.S. at 818. In assessing

whether the law was clearly established at the time, the court must to consider all relevant

legal authority, whether cited by the parties or not. *Elder v. Holloway*, 510 U.S. 510, 512

(1994). If public officials of reasonable competence could differ on the lawfulness of

defendant's actions, the defendant is entitled to qualified immunity. *Malley v. Briggs*, 475

U.S. 335, 341 (1986).

> **B.     A genuine issue of material fact exists as to whether the law enforcement
> Defendants violated Robbins clearly established Fourth Amendment right to
> be free from a *Terry* stop unsupported by reasonable suspicion**

It has been clearly established law since 1979 that a police officer must have at least "a

reasonable suspicion, based on objective facts, that the individual is involved in criminal

activity" before detaining him for a *Terry* stop.[1] *Brown v. Texas*, 443 U.S. 47, 51 (1979).

Similarly, an individual has no obligation to identify himself if the officer lacks reasonable

suspicion to believe that he is involved in criminal conduct. *Id.* at 50-52. These two legal

principles remain black letter law. *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (2008)

("to arrest for concealing identity, there must be reasonable suspicion of some predicate,

underlying crime").

The *Brown* decision illustrates these principles. In *Brown*, two law enforcement officers

were cruising in their patrol car when they observed Brown and another man walking in

opposite directions away from one another in an alley. *Brown*, 443 U.S. at 48. One officer got

---

[1] The law enforcement Defendants assert they are entitled to qualified immunity because there
was no clearly established First Amendment right to record law enforcement officers at the time of
Robbins' arrest. (Def's MSJ Memo. at 7-8). This assertion is not only incorrect, it misses the mark on
the qualified immunity analysis on Robbins' Fourth Amendment claim. As explained below, the unanimous
modern consensus is that recording police activity from a public place is protected speech. In any event,
the existence of a First Amendment right to record police activity is immaterial to the question of whether
a police officer can detain someone without reasonable suspicion or initiate an arrest absent probable
cause.

out and asked Brown to identify himself and explain what he was doing there. *Id.* at 48-49. The officer testified that he stopped Brown because the situation "looked suspicious and [they] had never seen the subject in that area before." *Id.* at 49. The area of El Paso where Brown was stopped had a high incidence of drug traffic. *Id.* The officers, however, did not claim to suspect Brown of any specific misconduct, nor did they have reason to believe that he was armed. *Id.* Brown refused to identify himself and angrily asserted that the officers had no right to stop him. *Id.*

On these facts, the Court held that "none of the circumstances preceding the officers' detention of [Brown] justified a reasonable suspicion that he was involved in criminal conduct. *Id.* at 51-52. While one of the officers testified trial that Brown "looked suspicious" but could not identify any facts supporting that conclusion. *Id.* at 52. The Court also noted that nothing in the record indicated it was unusual for people to be in the alley. *Id.* And, the fact that Brown was in a neighborhood frequented by drug traffickers, standing alone, is not a basis for concluding that he was engaged in criminal conduct. *Id.*

From *Brown*, it follows *a fortiori* that the law enforcement Defendants lacked reasonable suspicion to detain Robbins. At the time of his initial detention, the only activity that Robbins was engaged in was walking on a public sidewalk and videotaping public events. Robbins was carrying only a video camera, was visibly unarmed, and dressed in clothing that made it readily apparent that he was unarmed. Robbins was not violating any law, was not acting suspiciously or furtively, was not threatening any person, and was not interfering with any activities of the police. Although the law enforcement Defendants are not required to identify a specific criminal act, they must show that they actually suspected criminal activity. *Id.* at 51. In their summary judgment brief, the law enforcement Defendants identify the following facts as the basis of their claim that reasonable suspicion existed:

- Robbins "was photographing the personal vehicles of several officers in an area that had been the site of vehicle thefts and vandalism";[2]

- Detective Youngblut "had concerns over officer safety" and Robbins was "observing officers' movements"; and

- Detective Youngblut was aware of "previous stalking-type activities very similar, taking videos and monitoring activities of officers, that lead to the murder of a Des Moines Police Department Officer."

(Def's MSJ Memo. at 6-7). It is undisputed that Robbins violated no laws.[3] There is nothing inherently indicative of criminal activity in video recording items in plain view—even if it is police property. And, as explained in *Brown*, however, being in a high crime area is not a sufficient basis to suspect a person is engaged in criminal conduct. *Id.* at 52. Moreover, the law enforcement Defendants offer no facts about the prior thefts and vandalism (such as a description of the perpetrators or the time of day in which they were committed)[4] that would give a reasonable officer suspicion to believe Robbins' activity was related. While Detective Youngblut may have harbored a subjective concern about officer safety, there was no objective facts to suggest Robbins posed any danger. In this regard, the holding in *Brown* aligns squarely with this case in all material respects:

---

[2] There is a genuine issue of material fact as to what the law enforcement Defendants has reason to believe Robbins was filming. According to the body camera video of Office Michelle Strawser the reporting eyewitness explained Robbins' conduct as follows:

So she said that she . . .he's taking pictures of her car and then she was leaving in it. And he's taking pictures of her in her car from her [point of view]. And then that Lexus that's down there, he was taking pictures of that and then I pulled out so that's where he was.

(Officer Michelle Strawser Body Camera at 0:12:00 – 0:12:17). *See also* (Exterior Camera – East at 0:00:32 – 0:01:45).

[3] During the encounter, Lieutenant Leo told Robbins that he was loitering. To their credit, Defendants do not contend in their motion that Robbins was loitering.

[4] The Defendants produced in discovery

| *Brown v. Texas*, 447 U.S. 47 (1979) | *Robbins v. City of Des Moines* |
|---|---|
| Officers observed Brown and another man walking in opposite directions away from one another in an alley | Officers observed Robbins recording images in plain view from a public sidewalk adjacent to a police station |
| One officer got out and asked Brown to identify himself and explain what he was doing there. | Detective Youngblut pulled beside Robbins, leaned toward the passenger window and asked him what he was doing. |
| The Officer stopped Brown because the situation "looked suspicious" and they had never seen the subject in that area before | Robbins told Detective Youngblut that he was simply taking pictures.  Detective Youngblut told Robbins that he was being "a little suspicious" |
| The area of El Paso where Brown was stopped had a high incidence of drug traffic | The area had been the site of several vehicle thefts and acts of vandalism |
| The officers did not claim to suspect Brown of any specific misconduct, nor did they have reason to believe that he was armed. | Curtis told Robbins that he was not doing anything illegal but that he was acting suspicious.  Robbins asked what crime he had committed, and Detective Youngblut said it "was suspicious" for him to be in the area |

At a bare minimum, a jury question exists at to whether the law enforcement Defendants had reasonable suspicion to detain Robbins.

      **C.**      **A genuine issue of material fact exists as to whether the law enforcement Defendants violated Robbins clearly established Fourth Amendment right to be free from arrest absent probable cause**

The Fourth Amendment of the United States Constitution, made applicable to the States by way of the Fourteenth Amendment, guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It was clearly established well before the events in this case that in order to be valid under the Fourth Amendment, an arrest must be supported by a warrant or probable cause that a criminal offense has been or is being committed.  *See United States v.* Watson, 423 U.S. 411,

417-24 (1976); *Gerstein v. Pugh*, 420 U.S. 103, 111-12 (1975); *Brinegar v. United* States, 338 U.S. 160-175-76 (1949). Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). In determining the validity of an arrest, the court must look to the applicable state law as it pertains to the offense at issue—in this case the law of the State of Iowa. *Ker v. California*, 374 U.S. 23, 37 (1963).

A reasonable factfinder could conclude that the law enforcement Defendants escalated the investigatory stop into an arrest that required probable cause. "An investigative stop may become an arrest if it lasts for an unreasonably long time or the officers use unreasonable force in executing it." *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992). In determining whether the amount of force used during an investigatory stope constitutes an arrest, the Court must consider:

> (1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

*United States v. Thompson*, 906 F.2d 1292, 1296 (8th Cir. 1990). All six factors weigh heavily in Robbins favor.

The video from Detective Youngblut's body camera reveals that as many as six police officers, including two uniformed officers, encircled Robbins. With respect to the nature of the crime, the only mention of a possible crime that Robbins had committed was loitering. There was no reason to believe that he was armed. There was no need for immediate action. Indeed, Officer Michelle Strawser and Detective Demoss were aware that Robbins was filming them from a public sidewalk and did nothing. (Exterior Camera – Southeast at 0:02:36 – 0:03:50). Similarly, prior to the encounter, Detective Youngblut walked by Robbins while he was filming

and took no immediate action. (Exterior Camera – Southeast at 0:04:08 – 0:04:30). Later on, during the encounter, Sergeant Curtis informed Robbins that he was free to leave. When Robbins declared his intent to remain on the sidewalk, they informed him that he was going to be detained for loitering. Then, the officers physically seized Robbins with force, placed him against the hood of a truck in full view of the public, and took away his camera, vape, and cell phone. On these facts, a reasonable juror could conclude that Robbins was arrested.

A genuine issue of material fact exists as to whether the law enforcement Defendants possessed probable cause to arrest Robbins. As an initial matter, they have not identified a crime for which probable cause would have existed. It is not a crime to stand on a public sidewalk and record images of things in plain view. At no time did Robbins make any threats or take any aggressive actions against the officers. Nor did he attempt to flee or leave. The only potential reason the law enforcement Defendants offer for arresting Robbins is his failure to identify himself and explain why he was filming. (Def's MSJ Memo. at 9-10). The police cannot arrest an individual solely for refusing to provide identification.[5] *Brown*, 443 U.S. at 52. On these facts, a jury could conclude that the law enforcement officer's violated Robbins' right to be free from warrantless arrest absent probable cause.

## II.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON ROBBINS' CLAIM THAT THEY SEIZED HIS CAMERA AND PHONE IN VIOLATION OF THE FOURTH AMENDMENT

Robbins also supports his section 1983 claim with an allegation that the law enforcement Defendants lacked a warrant or probable cause to seize his camera and cell phone. The law enforcement Defendants counter that:

---

[5] Defendants' reliance on *Waters v. Madson*, ___ F.3d ___, 2019 WL 1567547 (8th Cir. Apr. 11, 2019), is misplaced. In *Waters*, the court did not decide the issue of probable cause because it concluded no arrest occurred. *Id.* at *16-20. Instead, the court concluded that it was simply an investigatory stop based on reasonable suspicion that Waters had committed a theft because he refused to comply with the store's posted sign declaring that vehicles in the lumber yard were subject to inspection. *Id.* at *27-29.

> there is no constitutional right to avoid seizure of recording devices, and there is no clearly established right to avoid seizure of recording devices when a person is acting suspiciously and then refuses to explain why he is taking photographs of officer movements and their personal and official vehicles.

(Def's MSJ Memo. at 10).  They further assert that they had "probable cause to seize [the] cameral to investigate whether Mr. Robbins was engaged in criminal activity related to the vehicles."  (Def's MSJ Memo. at 10-11).  They are wrong on both accounts.

A.   **The law enforcement Defendants' seizure of Robbins' camera without a warrant or probable cause to believe that it is evidence of a crime violates the Fourth Amendment**

There is no meaningful dispute that at the time of the encounter, Fourth Amendment jurisprudence clearly established "seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable. *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993).  In certain circumstances, the police may seize evidence in plain view without a warrant.  *Arizona v. Hicks*, 480 U.S. 321, 326 (1987). Absent some "operational necessit[y]," however, the police may not seize an item in plain view without probable cause to associate the property with criminal activity.  *Id.* at 326-27. "[I]f police lack probable cause to believe the object in plain view is contraband, i.e. if its incriminating character [is not] immediately apparent, the plain view doctrine cannot justify its seizure."  *Dickerson*, 508 U.S. at 375.

Viewing the facts in the light most favorable to Robbins, a reasonable factfinder could conclude that the law enforcement lacked probable cause to believe was associated with criminal activity.  A camera is not contraband.  The filming of people, places, and things (including police officers) in public is not illegal.  The law enforcement Defendants did not (and do not) allege that Robbins did anything illegal during their encounter.  Instead, their claim that probable cause existed arises from prior thefts and vandalism in the area along with an ambush-style attack on two officers in another part of town in nearly two years earlier.  Yet, they furnish no facts—other

11

than the existence of the past crimes—that would tie Robbins' conduct and his camera to those

events.  In fact, Robbins specifically asked for the legal basis for the seizure of his camera:

> YOUNGBLUT: Yeah, I'm gonna make a *suspicious activity* case, put the camera on property until he can give me a logical reason as to why he's recording it.
>
> * * *
> Are we confiscating this then til we know what reason he is down here and the suspicious activity?
>
> ROBBINS: Do you have a warrant?
>
> YOUNGBLUT: No, I'm going to confiscate it *for suspicious activity* until you can . . .
>
> ROBBINS: You think it was involved in a crime?
>
> YOUNGBLUT: 724 can you show me out at 25 East 1st, and I'll get a case number for *suspicious activity*.
>
> ROBBINS: Was it involved in a crime?  That's what I wanna [inaudible]
>
> YOUNGBLUT: I don't know yet, I've got to investigate it.
>
> ROBBINS: Okay, you don't know if there's been a crime or not?
>
> YOUNGBLUT: Nope, we're going to investigate though.

(Youngblut Body Camera at 0:06:55 – 0:08:06).  In this way, the law enforcement Defendants'

view of seizing property first and using the subsequent investigation to establish probable cause

turns the Fourth Amendment on its head.  *Hicks*, 480 U.S. at 326-28 (seizure of stereo

equipment based on reasonable suspicion rather than probable cause violates the Fourth

Amendment).  In short, no objectively reasonable person in the law enforcement Defendants'

position could have believed that there was probable cause associate Robbins' camera with

criminal activity.

> **B.**   **The law enforcement Defendants' seizure of Robbins' camera without a warrant or probable cause to believe that it is evidence of a crime violates the Fourth Amendment**

The law enforcement Defendants had absolutely no suspicion to believe that Robbins' cell phone was involved in criminal activity.  They offer nothing in the summary judgment record from which a reasonable factfinder could infer that Robbins ever used it at all before or during the encounter.  The conversation between Detective Youngblut and Detective Josh Rhamy confirms the purely speculative nature of the use of Robbins' cell phone:

> RHAMY:        He might have something on his phone too.
>
> YOUNGBLUT:    Yeah, we should probably take that too.  Just, I don't
>               know if you took any photos of that.  It's a Samsung.
>               We can get that search warrant as well.

(Youngblut Body Camera 11:34 - 11:42).

## III.   THE LAW ENFORCEMENT DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON ROBBINS' FIRST AMENDMENT RETALIATION CLAIM

In Count I of his Complaint, Robbins also asserts a claim under 42 U.S.C. section 1983 against the law enforcement Defendants for violation of his First Amendment rights to (1) record images in plain view at a reasonable time, place, and manner that did not interfere with any police activities, (2) question their lawful authority, and (3) assert his constitutional rights without retaliation.  "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).  Accordingly, "retaliation by a government actor in response to an exercise of First Amendment rights forms a basis for section 1983 liability." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).

To establish his claim, Robbins must he:  (1) engaged in a constitutionally protected activity; (2) that the government official's adverse action caused him to suffer an injury which would "chill a person of ordinary firmness from continuing in that activity"; and (3) that the

adverse action was motivated in part by the exercise of his constitutional rights." *Id.* at 927-28. The law enforcement Defendants do not challenge Robbins' prima facie case. Instead, they assert they are entitled to qualified immunity. Their logic follows in two steps: (1) there is no constitutional right to record the movements of law enforcement officers; and (2) even if there was, they are entitled to qualified immunity because the right was not clearly established at the time.

The video evidence shows Robbins engaging in multiple activities protected by the First Amendment. First, he stood on a public sidewalk and recorded images of what appear to be personal vehicles of police officers illegally parked under "no parking" signs on the street adjacent to the police station. Second, he verbally questioned the lawfulness of his detention and interrogation. Finally, Robbins refused to leave the public sidewalk when he was told he was free to leave.

### A. Robbins had a clearly established right to be free from retaliation for recording images in plain sight from a public place

The First Amendment prevents Congress from making any law abridging freedom of speech or of the press. The mode of audio-video recordings expressly has been recognized fall "within the free speech and free press guaranty of the First and Fourteenth Amendments." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952); *see also Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) (observing that the First Amendment protects actual photos, videos, and recordings). As far back as 1972, the U.S. Supreme Court made clear First Amendment protection extended to gathering information as well as publishing information. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated"). Moreover, the constitutional protections enjoyed by the traditional press apply to all citizens. *Citizens*

*United v. FEC*, 558 U.S. 310, 352 (2010) ("We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers"). The law, therefore, was clearly established at the time of Robbins' arrest that the First Amendment protected his right to gather information by means of video recording events in plain view from a public sidewalk. *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) ("There is an undoubted right to gather news from any source by means within the law") (quoting *Branzburg*, 408 U.S. at 681-82). The law enforcement Defendants view that video recordings lose constitutional protection if they capture footage of police officers is not only unsupported by any legal authority—it is illogical. "[I]t is difficult to see why [First Amendment protection of filming] should disappear simply because their subject is public police activity." *Higginbotham v. City of New York*, 105 F. Supp.3d 369, 379 (S.D.N.Y 2015). To the contrary, "dissemination of information related to alleged government misconduct . . . l[ies] as the core of the First Amendment." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034-35 (1991). "There is practically universal agreement that a major purpose of 'the First Amendment' was to protect the free discussion of governmental affairs." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011).

The ability to scrutinize the actions of public servants lies at the core of the First Amendment. For this reason, every court of appeals to address the issue on the merits in the last decade and a half has recognized that the First Amendment protects video recording of public official activity. *See, e.g., Turner v. Driver*, 848 F.3d 678, 690 (5th Cir. 2017) ("We agree with every circuit that has ruled on this question . . . the First Amendment protects the right to record the police"); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("the Constitution protects the right of individuals to videotape police officers performing their duties in public"); *Adkins v. Limitiaco*, 537 Fed. App'x 721, 722 (9th Cir. 2013) (holding that allegations that plaintiff was

arrested in retaliation for taking photos of the police in public stated a claim for First

Amendment retaliation); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 599-600 (7th Cir. 2012)

(holding that a statute that would prohibit recording police officers with a cell phone violated the

First Amendment); *Glik v. Cunniffe*, 655 F.3d 78, 79 (1st Cir. 2011) (holding "unambiguous" the

constitutional right to videotape police activity); *Cumming*, 212 F.3d at 1333 (11th Cir. 2000)

(finding "a First Amendment right, subject to reasonable time, manner and place restrictions, to

photograph or videotape police conduct"); *Iacobucci v. Boulter*, 193 F.3d 14, 25 (1st Cir. 1999)

(holding that filming public officials in a public area "was done in the exercise of [Plaintiff's]

First Amendment Rights"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (holding

that recording of police conduct fell within the "First Amendment right to film matters of public

interest"); *Williamson v. Mills*, 65 F.3d 155, 157-59 (11th Cir. 1995) (reversing the district court's

grant of qualified immunity to a police officer who arrested and seized the film of a political

demonstration participant).  The right also has long been recognized among the lower courts as

well.  *See Crawford v. Geiger*, 2015 WL 5569007 at *14 and n.5; *Higginbotham v. City of New

York*, 105 F. Supp. 3d 369, 380 (S.D.N.Y. 2015); *Buehler v. City of Austin*, No. A-13-CV-1100-

ML, 2015 WL 737031 at *9 (W.D. Tex. Feb. 20, 2015) ("In light of the existing Fifth Circuit

precedent and the robust consensus among circuit courts of appeals, the Court concludes that

the right to photograph and videotape police officers as they perform their official duties was

clearly established at the time of Buehler's arrests"); *Alliance to End Repression v. City of

Chicago*, Civ. No. 74 C 3268, 2000 WL 562480, at *21 (N.D. Ill. May 8, 2000) (recognizing

"taking photographs of the police" as protected by the First Amendment); *Connell v. Hudson*,

733 F. Supp. 465, 470-71 (D.N.H. 1990) ("According to principles of jurisprudence long respected

in this nation, Chief Brackett could not lawfully interfere with Nick Connell's picture-taking

activities unless Connell unreasonably interfered with police and emergency functions");

*Lambert v. Polk County*, 723 F. Supp. 128, 133 (S.D. Iowa 1989) ("It is not just news

organizations . . . who have First Amendment rights to make and display videotapes of events – all of us . . . have that right"); *Channel 10, Inc. v. Gunnarson*, 337 F. Supp. 634, 638 (D. Minn. 1972) (recognizing "constitutional right to have access to and to make use of the public streets, roads and highways . . . for the purpose of observing and recording in writing and photographically the events which occur therein").  The law enforcement Defendants offer no case to the contrary.  And for good reason—there is no modern dissent on this point.

The Eighth Circuit Court of Appeals has explained that a "right is clearly established if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Mitchell v. Shearrer*, 729 F.3d 1070, 1076 (8th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  It does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  Here, the circumstances were not novel and any reasonable officer would have known that he or she may not arrest an individual for recording the officer's public, professional behavior.  As of May 2018, five federal circuit courts of appeals and numerous lower courts had held there is a First Amendment right to record police activity. No federal circuit court of appeals had rejected that right.  Because no reasonable law enforcement officer would believe he or she could retaliate against an individual for filming them in public, the law enforcement Defendant's may not rely upon qualified immunity.

**B.    Robbins had a clearly established right to protest the police action without retaliation**

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v.* Moore, 547 U.S. 250, 256 (2006).  The First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v.* Hill, 482 U.S. 451 461 (1987).   Speech directed at police, other than

"fighting words" or obstruction, has always been protected speech. *Id.*; *Lewis v. City of New Orleans*, 415 U.S. 130, 133-34 (1974). The right to speak out without government retaliation was clearly established at the time of Turner's detention, handcuffing and arrest. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish this nation from a police state," *Hill*, 482 U.S. at 462-63, and is therefore "high in the hierarchy of First Amendment values." *Lozman v. City of Riviera Beach*, ___ U.S. ___, 138 S. Ct. 1945, 1955 (2018). As the United States Supreme Court has explained, if "there is any fixed star in our constitutional constellation, it is that no official, high or petty" can compel citizens to speak. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Robbins, therefore, had a First Amendment right to criticize the law enforcement Defendants' conduct as well as the right to decline to cooperate with their investigation and "go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Accordingly, the right to criticize police conduct without government retaliation was clearly established at the time of Robbins' arrest and seizure of property. Qualified immunity, therefore, is not proper in this case.

## IV.   THE CITY IS NOT ENTITLED TO SUMMARY JUDGMENT ON ROBBINS' *MONELL* CLAIM

Contrary to the City's argument, and assuming this Court were to grant the law enforcement Defendants qualified immunity on the First Amendment issue, that analysis of qualified immunity does not settle Robbins' First Amendment claim against the City because qualified immunity does not extend to municipalities. See *Owen v. City of Independence*, 445 U.S. 622, 657 (1980) ("municipalities have no immunity from damages liability flowing from their constitutional violations"). While it is true that officials may not be liable under section 1983 because their actions (or failure to act) were not constitutional violations according to clearly established law at the time the actions took place, a municipality may nevertheless be

liable if the actions complained of rise to the level of constitutional violations in light of present law. *Id.* at 657–58. Stated another way, it is possible that city officials may be entitled to qualified immunity for certain actions while the municipality may nevertheless be held liable for the same actions.

In *Monell v. Department of Social Services of the City of New York*, the Supreme Court determined that local governmental bodies may be held liable 42 U.S.C. section 1983 based on the unconstitutional actions of its individual agents or employees only where they acted pursuant to an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. 436 U.S. 658, 690–91 (1978); see also *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Accordingly, a plaintiff seeking to impose section 1983 liability on a municipality must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). The policy or custom may be "an express policy, such as a written ordinance or regulation;" a decision by "a person with final policymaking authority;" "an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens;" or "a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotation marks omitted).

In addition, the Supreme Court has not foreclosed the possibility that a single violation of constitutional rights could trigger municipal liability, where the violation is accompanied by a showing that the municipality had "failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 409 (1997). In determining whether the need for training or other safeguards was "obvious," however, we look to whether the employee violated a "clear constitutional duty" and whether there were "clear constitutional guideposts" for municipalities in the area. *City of*

*Canton v. Harris*, 489 U.S. 378, 386-97 (1989) (O'Connor, J., concurring in part and dissenting in part).  Clarity of the municipal obligation is important in this context, because "[w]ithout some form of notice to the city, and the opportunity to conform to constitutional dictates both what it does and what it chooses not to do, the failure to train theory of liability could completely engulf *Monell*, imposing liability without regard to fault." *Id.* at 395; *Szabla v. City of Brooklyn Park, Minnesota*, 486, F.3d 385, 390 (8th Cir. 2007), citing with approval *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir.1997) ("A municipality would thus evince a deliberate indifference to the constitutional rights of its citizens by failing to train its employees with respect to a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face.") (emphasis added) (internal quotation omitted); *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir.1995)

In order to state a viable section 1983 claim against the City of Des Moines, Robbins has to induce evidence sufficient to show a jury that (1) the City's officer-training practices were inadequate; (2) the City was deliberately indifferent to the rights of others in adopting these training practices, and the City's failure to train was a result of deliberate and conscious choices it made; and (3) the City's alleged training deficiencies caused Robbins' constitutional deprivation. *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir.1996) (citing *Canton*, 489 U.S. at 389).  The City's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395.

It is this policy of inaction and the City's failure to train the individual and the law enforcement Defendants to the ubiquitous and recurrent situation of citizens video recording their public duties that is at issue here.  Even the International Association of Chiefs of Police ("ICAP") has recognized this and the need for its officers to be on notice and have adequate training, noting: "The proliferation of portable video recording capabilities in cellphones, smart

phones, and similar devices has made it easy for the public to record events and activities—
including the actions of police officers performing their duties in public places [and] [a]s
technology advances, recording of police actions is likely to increase." *See* ICAP Law
Enforcement Policy Center: *Recording Police Activity* (Dec. 2015).[6]  ICAP goes on to advise
officers that "[a]rrests of individuals who are recording police activities must be based on
objective, articulable violations of the law that are unrelated to the act of recording alone.
Recording of the police does not, of itself, establish legal grounds for arrest, issuance of citations,
or taking other actions to restrict such recordings. *Id.* In fact, in December 2015, almost three
years before the Plaintiff was confronted here, ICAP developed a model policy on recording
police activity that advises officers that citizens in public spaces have a First Amendment right
to record police officer activity and that absent an arrest the citizens recording equipment could
not be seized nor could the citizen be made to show recordings to officers. *See Recording Police
Activity Model* (Dec. 2015).[7]

  Viewing the limited record in this matter in a light most favorable to Robbins, the City
was on notice of clear constitutional duty implicated in training officers that citizens had the
First Amendment right to record officers and the City has no policy or training in place
regarding this constitutional right or the contours of that constitutional right.  To begin with,
the City has provided no materials showing that the constitutional training given to officers
includes specifics on the First Amendment rights of citizens to film police officers.  (Def. MSJ

---

  [6]  Available at https://www.theiacp.org/sites/default/files/2018-08/RecordingPolicePaper.pdf (last
accessed May 10, 2019); *see also* Statement of Interest by Jonathan M. Smith, Chief, Special Litigation
Section, U.S. Department of Justice, Civil Rights Division (May 14, 2012), available at
http://www.justice.gov/crt/about/spl/documents/Sharp_ltr_5-14-12.pdf  (last accessed may 10l 2019)
(Policies should affirmatively set forth the contours of individuals' First Amendment right to observe and
record police officers engaged in the public discharge of their duties. Recording governmental officers
engaged in public duties is a form of speech through which private individuals may gather and
disseminate information of public concern, including the conduct of law enforcement officers).

  [7] Available at https://www.theiacp.org/sites/default/files/2018-08/RecordingPolicePolicy.pdf, (last
accessed May 10, 2019).

App. at 28).  Although the Patrol Service Bureau Standard Operating Procedure – Chapter 10 –

Field Operations mentions "Freedom of Speech and Assembly" nowhere does it indicate that

officers are trained on the rights of citizens to record their public activities.  (Def. MSJ App. at

28).  Likewise, the Recruit Training Class Manuals and Syllabi the law enforcement Defendants

provide evidence no specific training on the First Amendment recording rights of citizens nor the

rights of citizens to not have their recording equipment seized.  (Def. MSJ App. 33-139).

Also, in addition to the current lawsuit, there were at least three other instances in

which citizens had reported to City and its police department's Office of Professional Standards

("OPS") that their First Amendment rights to film has been infringed.  (Pl. MSJ App. at 6 - OPS

Call Log).  On June 3, 2016, a citizen complained of being harassed and told to "quit

videotaping" Des Moines Police Officer Trimble's arrest of a suspect.  (Pl. MSJ App. at 6 - OPS

Call Log).  When the citizen requested a letter acknowledging that Trimble had been spoken to

about the incident, the citizen was told that is "not DMPD policy."  (Pl. MSJ App. at 6 - OPS Call

Log).  Complainant was not arrested and was told to stop recording even though such activity is

their constitutional right.  There is also no indication that Trimble received any training or

retraining on the issue.

On June 22, 2017, Robbins complained to OPS when DMPD Officer Garrett approached

Plaintiff about filming Garrett's arrest of a suspect.  (Pl. MSJ App. at 6 - OPS Call Log).  It is

noted in the call log that Robbins is "a scanner jumper who shows up at police calls and videos

officer actions.  (Pl. MSJ App. at 6 - OPS Call Log).  Officer Garrett "confronted" Robbins after

the arrest.  Although the call log notes that Officer Garrett's body cam "proves he did nothing

wrong," the video footage was not provided to Robbins.  (Pl. MSJ App. at 6 - OPS Call Log).

Again, there is no indication of what the result of the OPS complaint was and whether there

was a training or retraining given to the officer.

Lastly, on November 12, 2018, DMPD Officer Chad Nicolino arrested a woman who was recording her son's arrest that evening on Court Avenue. (Pl. MSJ App. at 6 - OPS Call Log). Although the call log notes the complaining husband "was able to see why his wife was arrested," (Pl. MSJ App. at 6 - OPS Call Log) , the accompanying video shows Nicolino telling the woman to get out of the street when she pulls out her phone to record. (Pl. MSJ App. Nicolino Video). There are lots of people milling around in the street and Nicolino grabs and blocks the woman from exiting the street even though that is exactly what he has requested her to do. (Pl. MSJ App. Nicolino Video). As before, there is no indication of what the final result of the OPS investigation was and no indication or training or retraining for Nicolino. (Pl. MSJ App. Nicolino Video).

Further evidencing the City's deliberate indifference to Robbins' constitutional rights is its inability to document and/or track instances of interactions or criminal charges filed against citizens where the recording of officers was at issue. The City indicated in discovery responses that "[t]he City of Des Moines does not track or categorize cases based on such information." (Pl. MSJ App. at 3-4 –Supplemental Response to Plaintiff's Request for Production). With the ubiquitousness of cell phones, the City's lack of tracking of how its officers are handling of situations where officers confront citizens recording them is tantamount to a adopting "a policy of inaction." *Canton*, 489 U.S., at 395; *Brown*, 520 U.S. at 407 (deliberate indifference by a municipality may be shown, for example, where municipal decisionmakers are put on notice that a policy or practice is ineffective and leads to constitutional violations, but they continue to adhere to the same approach); *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction").

Because the City does not have a First Amendment Recording Police Policy or any specific training related to such issues and because it has actual knowledge that the prevalence

of cell phones makes the issue of citizen/police recording encounters commonplace and furthermore it makes no effort to track such encounters, summary judgment on Robbins' *Monell* claim against the City must be denied.

## CONCLUSION

Viewing the facts in the light most favorable to Danny Robbins and giving him the benefit of all reasonable factual inferences, as the Court must, leaves no doubt as to the proper ruling on Defendants' motion for summary judgment.  The motion must be denied in its entirety.

Respectfully submitted,

s/*Gary Dickey*

Gary Dickey, AT0001999
DICKEY & CAMPBELL LAW FIRM, P.L.C.
301 East Walnut Street, Suite 1
Des Moines, IA, 50309
Tel:  515-288-5008  Fax:  515-288-5010
gary@dickeycampbell.com

s/*Glen S. Downey*

Glen S. Downey, AT0012428
Law Offices of Glen S. Downey, LLC
5214 Ingersoll Avenue
Des Moines, IA, 50312
Tel:  412.865.7110
glen@downey-law.net

*Attorneys for Daniel Thomas Robbins*

CERTIFICATE OF SERVICE
The undersigned hereby certifies that on 05/10/19 a true copy of the foregoing instrument was served upon each of the attorneys of record, or the parties if unrepresented, at their respective addresses disclosed on the pleadings electronically and by U.S. Mail.

Signature: /s/ Gary Dickey